Depositions/Testimony
For Earl Peeples, M.D.
Since January 2014

| Date | Type | Name |
|------|------|------|
| 01/21/14 | Deposition | Carlton Lewis |
| 01/21/14 | Deposition | Sammie Ellie |
| 02/21/14 | Deposition | Parkison |
| 03/04/14 | Deposition | Billy Murray |
| 03/12/14 | Live Testimony | Brent Moore |
| 03/26/14 | Deposition | Ammons |
| 04/04/14 | Deposition | Casey Reed |
| 04/14/14 | Live Testimony | Ammons |
| 05/05/14 | Deposition | Pipkin |
| 05/08/14 | Deposition | St. Christopher |
| 05/16/14 | Deposition | Tipton |
| 05/30/14 | Live Testimony | Laurie Grayson |
| 06/26/14 | Live Testimony | David Pipkin |
| 08/27/14 | Live Testimony | Charles Tipton |
| 09/18/14 | Live Testimony | Sammie Eddie |
| 10/06/14 | Deposition | Banks |
| 10/07/14 | Deposition | Lybrand |
| 11/12/14 | Live Testimony | Cosondra Wisdom |
| 01/29/15 | Live Testimony | Sheryl Little |
| 03/17/15 | Live Testimony | Vicki Banks |
| 08/12/15 | Live Testimony | Cherise Graham |
| 10/20/15 | Deposition | Tommy Zimmerman |
| 11/12/15 | Deposition | Edward Lybrand |
| 12/23/15 | Deposition | Connie Parker |
| 02/26/16 | Deposition | Shawn Royal |
| 03/03/16 | Live Testimony | Dawn Bishop |
| 04/12/16 | Deposition | Aretha Daniels |
| 08/23/16 | Live Testimony | Sharon Glover |
| 09/16/16 | Deposition | Johnny Walker |
| 09/23/16 | Deposition | Aaron Jeffery |
| 11/03/16 | Deposition | Richard Rodriguez |
| 1/11/17 | Live Testimony | Johnnie Walker |
| 5/3/17 | Deposition | Thomas Sanders |
| 7/21/17 | Deposition | Mark Brown |
| 8/23/17 | Deposition | Madison McCaslin |
| 8/29/17 | Deposition | Thomas Sanders |
| 12/21/17 | Deposition | Casey Cutshall |
| 02/21/18 | Deposition | Alice Young |
| 03/15/18 | Live Testimony | Tonya Pate/Nicole Carter |
| 08/28/18 | Live Testimony | Norma Williams |
| 10/15/18 | Deposition | Daryl Haynes |
| 03/07/19 | Deposition | Brian Parker |
| 5/22/19 | Deposition | Jimmy Ray Roland |
| 6/10/19 | Deposition | Craig Shipp |

| 8/22/19 | Deposition | Stacy Glinski |
| 9/11/19 | Live Testimony | Jimmy Ray Roland |

## CURRICULUM VITAE
## Raymond Earl Peeples, M.D.
OrthoArkansas, PA
10301 Kanis Road
Little Rock, Arkansas 72205

**BACKGROUND**

Date and Place of Birth:  March 6, 1951, Boston, Suffolk County, Massachusetts

**WORK HISTORY**

| | |
|---|---|
| OrthoArkansas, P.A | (501) 604-6900 Tel |
| 10301 Kanis Road | (501) 604-4169 Fax |
| Little Rock, AR  72205 | 07/01/79 – 2013 |

Peeples Medical Legal Consulting    06/2009 – Present

**UNDERGRADUATE MEDICAL EDUCATION**

Edison High School, Tulsa, Oklahoma, Graduated 1969, (Graduation rank 1/592, GPA 4.0)
University of Oklahoma, June 1969 to May 1970, (No degree - 92 hours premed work, GPA 4.0)

**HONORS**

National Merit Scholar, 1969
Lottinville Prize:  Outstanding Freshman Man, 1970, University of Oklahoma (1969-1970)

**MEDICAL EDUCATION**

University of Oklahoma College of Medicine, graduated 1974, MD

**POSTGRADUATE MEDICAL EDUCATION**

Baptist Memorial Hospital, Memphis, Tennessee 38103, Straight Surgical Internship, July 1, 1974 to June 30, 1975

University of Oklahoma Health Sciences Center, Oklahoma City, Oklahoma 73117, Orthopaedic Surgery Residency, July 1, 1975 to June 30, 1978

University of Colorado Health Sciences Center, Office of Graduate Medical Education, Denver, CO  80262,    Hand Surgery and Microsurgery Fellowship, July 1, 1978 to June 30, 1979

**MEDICAL LICENSURE**

Arkansas State Medical Board #N5620 (active), May 1979

**CERTIFICATION**

American Board of Orthopaedic Surgeons, Board Certified September 5, 1980



Earl Peeples, MD Orthopedic Surgeon

*47 Hickory Hills Circle, Little Rock, AR 72212*

*Contact number for physician 501 786 3756*

*fax (501) 224.8701    earl.peeples@att.net*

## List of Charges

| | |
|---|---|
| **Review Records/Report** | **$400/hour** |
| **Retainer as Expert (3 Hours Included)** | **$1200** |
| **Agreement to Testify Live (Credited to Testimony Fee)** | **$1000** |
| **Live Testimony** | **$2500/half day** |
| **Conference (Non Office Hours)** | **$400/hour** |
| **Conference** | **$400/hour** |
| **Deposition\*** | **$2000/2 hours and prep $800/each additional hour** |

**Other special charges and travel can be arranged.  \*Retainer of $2000 in advance is required to hold appointment date and time.  The administration of depositions requires 50% of the retainer is nonrefundable.  Cancellation within 10 days requires forfeit of the entire retainer**



**Earl Peeples, MD Orthopedic**

*47 Hickory Hills Circle*
*Little Rock, AR 72212*

Physician phone (501) 786-3756

Assistant (501) 786-1544

Facsimile (501) 224-8701

*earl.peeples@att.net*

September 13, 2023

Mr. Scott Tucker
Friday, Eldredge and Clark
400 West Capitol, Suite 2000
Little Rock, Arkansas 72201

RE: James Maples
PMLC# X3022
DOB: 8-14-1979

Dear Mr. Tucker:

At your request I reviewed medical records of James Maples provided in three volumes to correlate them with reported event 11-23-19 at Union Pacific Railroad.

METHODS:
See Addendum.

MEDICAL RECORDS:

Conway Regional Health System
12-6-19  Initial examination by Dr. Blair  for complaints of low back pain which started 15 days earlier after an event at work included some radiation into the left mid-thigh. "He is asking for MRI."   He stated that his wife was a nurse.  Examination indicated no acute distress.  No spine or neurological examination was performed despite the presenting complaints of low back pain with radiation to the thigh.  Symptoms were restated as assessments/diagnoses, "acute left sided low back pain with left side sciatica".  (Pages 000657-662)

James Maples
PMLC# X3022
Page 2

12-10-19 Evaluation by Dr. Blair used the same HPI (history of present illness). Pain was rated as 6/10. Again, the physical examination indicated no acute distress. No neurological examination was performed and recorded. (Pages 000650-655)

12-16-19 Conway Regional Medical Center MRI analysis by radiologist Albert Alexander MD discovered that no disc bulge or protrusion was present in the lumbar spine. Alignment was normal. Facet arthritis was present at the two lower levels, L4-5 and L5-S1. Foraminal stenosis was present. Impression was limited to "facet arthritis L4-5 and L5-S1." No traumatic lesions were described nor were acute signal changes identified in this study performed 23 days after the 11-23-19 incident eliminating physical damage/traumatic anatomy to the lumbar spine. All findings were degenerative.

>[No disc trauma was present. Criteria to establish such trauma are published in science literature.
>
>The requirements to classify the MRI appearance of a disc as traumatic have been determined and detailed in medical literature by the North American Spine Society, the American Society of Spine Radiology, and the American Society of Neuroradiology (The Spine Journal 14 (2014) 2525-2545).
>
>"The category of trauma includes disruption of the disc associated with physical and/or imaging evidence of violent fracture and/or dislocation and does not include repetitive injury, contribution of less than violent trauma to the degenerative process, fragmentation of the ring apophysis in conjunction with disc herniation, or disc abnormalities in association with degenerative subluxations . . .in the absence of significant imaging evidence of associated violent injury, should be classified as degenerative rather than trauma." (p. 2530-31)
>
>Thus, MRI documented normal for age lumbar spine anatomy with early multilevel degenerative changes.]

1-15-20 Evaluation of Mr. Maples was conducted by Dr. Blair (Pages 000641-647). Pain was rated 6/10. The dictation on this date was largely repeated in subsequent encounters.

Examination indicated no acute distress. Diagnosis of low back pain and left sided sciatica was assigned based on symptoms without neurological examination.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 3

3-25-20  Follow-up examination with Dr. Blair (pages 000634-640) entered a pain rating of 6/10.  The history of present illness entered here was repeated indicating symptom distribution in the back and buttock.  He was in no acute distress. No neurological examination was recorded.

4-24-20  On follow-up evaluation by Brian Blair MD,  back pain was rated 6/10.  Pain was in the low back and buttocks.  Some left leg radiation was reported.  Mr. Maples gave a history of seeing a neurosurgeon and "was told had bone spurs and some bulging discs."  On physical examination he was in no acute distress.

The electronic medical record exam paragraph was repeated indicating no limitations of range of motion.  No neurological examination was performed and recorded by Dr. Blair. (Pages 000627-000632)

8-18-20 Mr. Maples reported back pain rated at 6/10 in intensity. He was planning to see a St. Louis physician once COVID restrictions were lifted.  Pain was reported as constant. Mr. Maples requested Lyrica to see if that might help, and reported that St. Louis MRI had revealed a tear in the disc at L5-S1.  (Page 000614).  Surgery was planned in Missouri.

On examination he was in "no acute distress."  He had good range of motion of the spine. Neurological examination was not performed and recorded.


Records of Dr. Jim Adametz:
2-4-20  Initial examination by Dr. Adametz for chronic low back pain complaints extending back to a reported event at work 11-23-19.  Pain was rated as 5/10 on average with lower extremity pain 5/10.

Neurological examination was performed by Dr. Adamtez.  Reflexes of the lower extremities were normal.  Sensory examination in the lower extremities was normal. No neurological deficit or significant alteration of nerve function was recorded on objective exam.

Dr. Adametz summarized "he had MRI scan lumbar spine it reveals multilevel osteophytes and bulging disc but not really any acute disc rupture or anything major on exam."   Dr. Adametz indicated there were symptoms of lumbar radiculopathy but, "I do not see this [as] a specific injury on his back MRI scan."  Symptoms of left sacroiliac sprain are also recorded.  (Pages 000724-25)

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001784

James Maples
PMLC# X3022
Page 4

 [Symptoms do not establish radiculopathy.  Normal neurological exam excludes radiculopathy.  Treatment does not establish pathology.
The combination of subjective patient report (unreliable) and "post hoc" reasoning (false logic) is not a satisfactory objective basis for causative attribution.  This is emphasized in the AMA Guides Protocol for determining "Injury-Relatedness."  (AMA Guides Newsletter, May/June 2012)

2-18-20  Lumbosacral epidural injection by Dr. Adametz of was performed for diagnosis of  lumbar radiculopathy.  (Page 000726)

> [Sciatica, a symptom restatement, was a better working diagnosis.  No objective findings necessary to establish radiculopathy as a valid diagnosis were discovered in this record.
>
> AMA Guides defines radiculopathy as "Significant alteration in the function of a nerve root or nerve roots and is usually caused by pressure on one or several nerve roots.  The diagnosis requires a dermatomal distribution of pain, numbness and/or paresthesias in a dermatomal distribution.  A root tension sign is usually positive. The presence of findings on an imaging study in and of itself does not make the diagnosis of radiculopathy."  (AMA Guides to the Evaluation of Permanent Impairment, 5th Edition, page 382).  This record does not document radiculopathy fulfilling this definition.  Symptoms are not radiculopathy.  Data show that persisting radicular pain "is still compatible with function and that most patients should eventually return to their original type of work." (AMA Guides to the Evaluation of Work Ability and Return to Work, AMA 2011, p. 165).  Radiating symptoms, without objective verification of actual nerve compression and damage, are not a basis for permanent work restriction or impairment.]

3-19-20 Evaluation by Dr. Adametz (Pages 000729-730) indicated a chief complaint of "Acute Low Back Pain" in the lumbar spine.  There was some complaint of pain in the left SI joint region with radiation down to the left lower extremity. (The categorization of acute low back pain is inaccurate as the pain was greater than three months in duration extending back to onset in November, 2019, therefore chronic.)   No past history or review of systems was included.  Dr. Adametz indicated that he had performed an epidural steroid injection and then a sacroiliac joint injection which helped only slightly. Low back pain continued after these interventions. Dr. Adametz stated, "I reviewed the MRI scan and is much as there is minor abnormalities I do not see an operative lesion so I think the injections of medication will be our best option."

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 5

St. Louis Records:

6-22-20  Initial spine examination by Dr. Gornet (Pages 000165-167) was for "chronic low back pain in the lumbar spine radiating into both sides, both buttocks, both hips," but more extensively in into the left lower extremity.  Mr. Maples described an event of 11-23-19 where he was jarred by a vehicle incident when operating.  Dr. Gornet stated that Mr. Maples was "referred to a Dr. James Adametz.  He is a retired neurosurgeon and he performed an epidural steroid injection at L3-4 on 2-18-20 and an SI injection on the left 3-10-20.  None of these gave him significant improvement."  (Dr. Adametz is a practicing neurosurgeon, not retired.)   Mr. Maples provided a history of prior chiropractic care but no serious back problem.

> [Despite a presentation of chronic low back pain of nine months duration, no focused psychosocial history was performed and recorded.
>
> Clinical Guidelines for the Diagnosis and Treatment of Low Back Pain produced by the combined efforts of the American College of Physicians and the American Pain Society were published in 2007.
>
> Recommendation 1:  Clinicians should conduct a focused history and physical examination to help place patients with low back pain into 1 of 3 categories: nonspecific low back pain, back pain potentially associated with radiculopathy or spinal stenosis, or back pain potentially associated with another specific spinal cause.  The history should include assessment of psychosocial risk factors, which predict risk for chronic disabling back pain (strong recommendation, moderate-quality evidence).
>
> (Annals of Internal Medicine, Vol. 147, Number 7, p 478-491).
>
> These best objective evidence-based medical guidelines from highest quality professional organizations were ignored in this record.]

Physical examination indicated normal motor examination of the lower extremities, 5/5, equal and symmetric and normal.  Deep tendon reflexes "sensation is decreased in the S1 dermatome on the left to light touch."  Tension testing (SLR) was not performed and recorded.

Dr. Gornet described MRI findings on 12-16-19 from Conway Regional Hospital identifying mild disc protrusions at the lower three spinal levels.  Dr. Gornet indicated that the presentation of symptoms "are fairly classic of a disc injury."  He indicated that

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

UPRR 001786

James Maples
PMLC# X3022
Page 6

prior MRI had not been of adequate quality.  Dr. Gornet stated, "I do believe his current symptoms are causally related to his accident of 11-23-19."

> [The specific or type of "disc injury" was not stated.  "Injury" covers much but designates nothing.  No anatomic trauma/physical damage was identified on any study.  Dr. Gornet asserted a classic symptom pattern which identifies "disc injury".  Such a diagnostic pattern is not published in medical science.
>
> "There is not a causative relationship between structural changes in the spine and serious low back pain.  There is not a credible basis for an 'injury model' for low back pain."  (AMA Guides Newsletter, Jan/Feb 2013, Chronic Pain, Fundamental Scientific Considerations, Specifically for Legal Claims, p. 4)]

Re-evaluation later the same day included review of the new MRI performed that day. He discussed the MRI changes including annular tear disc "injury" at L5-S1.  (Annular tear is the same as annular fissure or high intensity zone, an indication of disc degeneration – see below.)  Epidural steroid injection was recommended and carried out later by another physician..

6-22-20 MRI report provided by Radiologist Matthew Ruyle MD (Pages 000191-92). The MRI findings indicated vertebral alignment was normal with no change in marrow signal. L1-2 and L2-3 were entirely normal, "At L3-4, disc hydration was preserved. There is a central 2 to 2.5 mm [1/10 inch] broad based protrusion best visible on sagittal T2-weighted images 12 near the midline and 13 just to the left of midline. This results in dural displacement but no central canal or foraminal stenosis."  He also stated, "At L4-5, disc hydration is preserved.  A central broad-based 2.5 mm protrusion is present. There is right lateral recess hyperintensity with the posterior annulus suspicious for an internal annular tear."   Some mild foraminal stenosis was reported.  "L5-S1 demonstrates a central hyperintense zone, in the posterior annulus . . . consistent with a central annular tear."   Some epidural fat was displaced but no neural compression or stenosis was identified.

> [This MRI confirmed multilevel degenerative changes in the lumbar spine on a 40 year old male consistent with age, but identified no physical damage/traumatic anatomy.
>
> Annular tear or annular fissure or HIZ (high intensity zone) is a degenerative finding.

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 7

In the American Journal of Neuroradiology, January 15, 2009, "Association between annular tears and disc degeneration, a longitudinal study," noted under conclusions that "annular tears occur in early stages of degeneration and are associated with a faster subsequent nuclear degeneration." There is a "strong association between annular tears and nuclear degeneration has been well demonstrated in a number of earlier studies." (Annular tears/fissures are part of degeneration, not indicative of specific trauma.) Invasive procedure or use of opiates for an annular tear/fissure is not appropriate evidence-based medical treatment.

Medical terms are precisely defined in published high quality objective evidence-based medical science. Lumbar Nomenclature Version 2.0 (The Spine Journal: Lumbar disc nomenclature: version 2.0, 14 (2014) 2525-2545) defines the annular abnormalities terminology to be applied:

"The terms "annular fissure" and "annular tear" have been applied to the findings on T2-weighted MRI scans of localized high intensity zones (HIZ) within the annulus. High intensity zones represent fluid and/or granulation tissue and may enhance with gadolinium. Fissures occur in all degenerative discs but are not all visualized as HIZ. Discography reveals some fissures not seen by the MRI, but not all fissures are visualized by discography." (p. 2531-2)

"As far back as the 1995 NAAS document, authors have recommended that such lesions be termed "fissures" rather than "tears," primarily out of concern that the word "tear" could be misconstrued as implying traumatic etiology. Because of potential misunderstanding of the term "annular tear," and consequent presumption that the finding of an annular fissure indicates that there has been an injury, the term "annular tear" should be considered nonstandard and "annular fissure" be the preferred term. Imaging observation of an annular fissure does not imply an injury or related symptoms, but simply defines the morphologic change in the annulus." (p. 2532)

In short, an annular "tear" (fissure, HIZ) is not traumatic nor an injury, but part of disc degeneration.]

7-24-20 Discography operative report by surgeon Matthew Gornet listed preoperative diagnosis as "evaluate discogenic low back pain." At the L3-4 level "the nucleogram appeared to be degenerative with posterior annular tear." Pain was rated as 8/10 upon testing. At L4-5 the nucleogram appeared to be for the most part normal with "suggestion of posterior annular tear." This disc was not provocative. At L5-S1 discogram indicated, "nucleogram appeared to be abnormal with obvious posterior

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001788

James Maples
PMLC# X3022
Page 8

annular tear."   Pain was rated 8/10.  Facet blocks were performed on the left at L3-4 and L4-5 and L5-S1.  (Pages 000877-78)

7-24-20 Radiographic interpretation was provided by orthopedic surgeon Gornet:
   "L3-4 revealed a degenerative nucleogram with posterior annular tear"
   "L4-5 revealed a relatively normal nucleogram with posterior left tear"
    "L5-S1 revealed a degenerative nucleogram of posterior annular tear"

   [All findings on the St. Louis MRI and Discography were by definition and description degenerative.  No traumatic findings were present in the lumbar spine studies.  The previous 12-16-19 MRI had eliminated acute traumatic anatomy/physical damage due to the 11-23-19 event.  These radiographic studies reinforce each other.]

7-24-20 CT lumbar post discogram was interpreted by Dr. Ruyle (Pages 000239) Annular tear was described on the right foraminal region at L3-4 with contrast extravasation from the disc.  At L4-5 left foraminal to lateral annular tear was identified. At L5-S1, an annular tear with contrast extravasation was also noted.

8-10-20 Reevaluation by Dr. Gornet (Pages 000162-3) described "main symptoms are structural low back pain predominantly to his left leg with numbness and tingling."

["Structural low back pain" is not standard medical nomenclature nor specific as to anatomic pathology.  "Non-structural low back pain", that is psychosocial or non-anatomic in origin was not evaluated.   No structural changes other than normal degeneration for age had been identified.]

Dr. Gornet continued by stating that the previous MRI showed some "suggestion" of "disc pathology", but subsequent MRI scan strongly "suggested" annular tear disc "injury" at L5-S1.  No response to the epidural steroid injection had occurred. Dr. Gornet indicated that a prior discogram had been performed indicating provocative discs at L3-4 and L5-S1.  "I have discussed with both he and his wife that these are structural problems in his spine and this is not a problem of neurological compression."  He predicted that Mr. Maples was unable to resume his work in track maintenance.

["Structural problems" of the spine is not a specific anatomic diagnosis.  There is no logical basis to state that his spine structure, unchanged by the event of 11-23-19, prevented resumption of his  work duties.  Symptoms do no harm and are not a basis for work exclusion.]

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 9


9-9-20 History and physical dictated by Dr. Gornet described symptoms of low back pain and pain into the LEs, left consistently and occasionally right. "He has tried and failure conservative measures."  Under images study, "MRI scan reveals mild disc protrusion at L3-4, L4-5 and L5-S1."   "Discogram revealed provocative disc at L3-4 and L5-S1, non-provocative at L4-5."  Physical examination section is absent from this history and physical dictation. (Pages 000843-44)

9-9-20 Operative report by Dr. Gornet indicated a preoperative diagnosis of "discogenic low back pain."  Decompression anteriorly was performed at L3-4 and L5-S1 with disc replacement at both levels.    "Operative indications" section was not identified.  No traumatic anatomy was described.   Degenerative changes in the form of "annular tear" were identified in both levels where disc replacement was performed.  (Page 000841-42)

1-11-21 Follow-up for PT evaluation by James Sanders (Pages 000749-??).  This examination takes place about four months following 9-9-20 disc replacement at two lumbar levels.  Pain was rated at 5/10 at evaluation and 8/10 at worst.  No radicular symptoms were recorded.  Prior to surgery he "was having intense radicular symptoms down the BLE."  (bilateral lower extremities - both)

[This does not correspond to the records of Dr. Blair and Dr. Adametz, which indicate LLE symptoms.]

4-5-21 On re-examination (Pages 000155-56) seven months postoperative radiographs indicated good position and alignment of the total disc implants at two levels. No physical examination was performed and recorded.  Plans were made for him to resume light duty with 40 pound weight limit on 5-3-21.


Skinner Chiropractic and Rehab:
Evaluations for low back pain complaints were conducted on:
      9-10-15
      8-4-16
      10-18-16
      2-27-17
      4-13-17
      5-11-17
      6-9-17

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001790

James Maples
PMLC# X3022
Page 10

6-26-17
He continued to complain of low back pain and receive treatment.

2-21-18 Chiropractor Tray Fowler indicated Mr. Maples had both plantar fasciitis and low back pain. Physical examination was performed and indicated chiropractic malalignments at 12 spinal levels including four in the lumbosacral region. Adjustments were provided.  (Pages 000129-31)

2-6-19 Mr. Maples returned continuing to have some plantar fasciitis and continuing to complain of low back pain.  Chiropractic subluxations were located at levels identical to evaluation one year before.  Twelve subluxations were recorded.  (Pages 000141-42)

6-18-19  "his lower back is really hurting."  Treatment was provided to the lumbar region.

 [These records document several years of low back and LE pain symptoms and treatment before 11-23-19.]


EXPERT RADIOLOGIST REPORT – Dr. McAlister:
12-16-19 The lumbar MRI was of high quality and identified no traumatic anatomy, matching the report of the primary radiologist. Despite 1.5mm axial images, no HIZs were discovered.

6-22-20 MRI was repeated and "there has been no significant interval change when compared to the older study."  (p. 9)

[Dr. McAlister's review confirms that no traumatic anatomy was identified in either MRI, matching the reports by Radiologists Alexander and Ruyle.]

7-24-20 Provocative discography/CT documented right sided L3-4 and L5-S1 fissures.

Dr. McAlister confirmed that no evidence of traumatic anatomy existed on the Arkansas radiographic studies.  Studies in Missouri "documented degenerative pathology with nuclear degeneration and degenerative annular fissures at each level." (p. 15)

"After reviewing the submitted records and diagnostic imaging, in my professional opinion, there is no traumatic pathology attributable to the incident of 11-23-19 but

James Maples
PMLC# X3022
Page 11

rather the anatomy is normal for his age with degenerative changes, none of which are severe, and a congenital increased lumbosacral angle." (p.15)

DR. GORNET DEPOSITION

[Requirements for offering expert medical opinions mandate the use of peer reviewed published medical science matching the allegation or issue questioned. Personal experience, training, practice pattern, and beliefs are not adequate or satisfactory substitute.

A "suggestion" is a hint or possibility at the very lower end of probability and cannot logically be substituted for the more probable than not standard in medical expert opinion.

Ten suggestions do not equal one more probable than not statement based on published medical science.

"Belief", however intensely held, and "feelings", however strong, are personal and cannot be substituted for factual science or evidence required in medical expert testimony.

Definitions established and published in the highest level medical science cannot be changed or replaced by individual physicians with different alternative meanings. A universe of standard published definitions insures consistent communication between physicians and when relying on medical literature.

Nonstandard, nonspecific, or personal terms are used by Dr. Gornet:
   Disc injury
   Structural back pain
   Disc pathology
   Beaking of a disc
   Blow that disc apart
   Structural problems
   Disc mechanism

I will comment on various statements in Dr. Gornet's deposition:

P. 14 ". .and his complaints are fairly classic of structural - - what we call structural discogenic pain." [There is no pattern of pain published in medical science for disc

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001792

James Maples
PMLC# X3022
Page 12

origin pain.  In fact, the presentation of back pain complaints in 80-90% of cases cannot be established as to anatomic origin.]

p. 15  "I felt that there were mild disc protrusions."  [Feelings are not a substitute for objective findings indentified more probable than not.]

"Subtle suggestions of beaking of a disc"  ["beaking" is not a medical term for disc pathology.]

P. 16  "the new MRI clearly showed what I felt was  an annular tear, disc injury, at L5-S1."  [Annular tear, fissure, or high intensity zone (HIZ) are all defined as degenerative as previously documented.]
A clear abnormality is visually apparent on MRI to multiple examiners, not felt by a single treating surgeon.

P. 17 "So he felt strongly enough that he injected the L3-4 disc."  [Dr. Adametz did not inject the disc but rather performed an epidural space injection entering at the level between the L3 and the L4 vertebrae.  This injection was not into the disc.]

"He has an injury to his disc and disc mechanism."  [Injury has no specificity, encompassing all and identifying no named trauma.  The disc mechanism is just the disc – it is not a machine.  This verbiage is squishy and non-standard.]

P. 18  "Now remember, this disc at L3-4, the previous doctor did a steroid injection there"  [This is a false statement; the disc was not injected; rather this was the level at which a needle was inserted avoiding the disc and entering the epidural space.]

P. 19  ". . we now have objective findings on MRI that correlate with his subjective complaints"  [Correlation is not causation.]

P. 21-2  He equates a "tear" in a disc with injury.  [Radiology MRI standards specify that annular tear is degenerative not traumatic and when "tear" is used, is deliberately misleading.]

P. 25  "strong suggestion" (l. 11-2) + "strongly suggested" (l. 20) + correlate + correlate (l. 21-22) = there's no doubt. (l. 22)  [hint + hint + correlate + correlate does not equal the more probable than not standard, let alone a medical standard of "no doubt."]

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 13

P. 26  "Well, again, what I would say is the tear in the disc, I believe, is an acute injury that occurred at the time of his accident."  [Annular tear is defined medically as a degeneration irrespective of Dr. Gornet's belief.]

"and he did not recall any previous problems that required any treatment . . . It only makes sense that the disc tears and becomes injured"  [Medical standards document that patient reports are not a reliable basis for causation.  Annular tears are not traumatic but degenerative.]

p. 30  Dr. Gornet pronounced these annular tears as "injury" based on Mr. Maples history.  "there is no plausible explanation - - other plausible explanation other than to associate it with his injury."  [The annular tears are NOT injury or trauma but are part and parcel of disc degeneration present in normal men of this age.  The plausible explanation is degeneration controlled by genetics and progressive with age producing annular fissures or HIZs.  Even more plausible is the dominant medical explanation for chronic low back pain complaints in the injured worker setting, psychosocial diagnoses or findings, in the presence of normal for age anatomy.]

P. 31 Dr. Gornet again uses the term "structural injury" and "blow that disc apart" without using the medical language of an experienced spine surgeon to delineate or name what specific abnormalities he means.  This is not an innocent use of language from a well educated orthopedist.

P. 33 Dr. Gornet tries to argue that the lack of prior treatment means that the annular tears he has identified are a "disc injury."  [Annular tears and disc protrusions are normal anatomy for this age and are not physical damage from single event (injury).  Multiyear chiropractic treatment for LBP and LE symptoms is ignored.]

P. 35 Dr. Gornet testifies that he has done more disc replacements that anyone else in the United States.  [Surgical volume of a specific type does not establish accurate causation knowledge and logic.]

P. 36  Q.  And when you talk about structural back problems, what exactly do you mean by that, "structural"?
       A.  Well, structural would be like what Mr. Maples had."
[This answer is a tautology, saying the same thing in other words.  He did not answer the question with medical terms or explanation.  He dodged.]

P. 38 "disc replacement is superior to fusion in all categories."

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 14

[Permanent weight lifting limitations (p. 41-2) were applied to Mr. Maples by Dr. Gornet after recovery from TDA surgery to protect the disc replacements.  Fusions allow return to full activities including unrestricted lifting.  This statement is an advertisement, not a medical fact.]

P. 56 "I believe the accident of 11/23/19 caused a disc injury at L3-4 and L5-S1."  [Dr. Gornet uses belief instead of more probable than not or to a reasonable degree of medical certainty on which to assert an opinion.  A belief is not medical science.]

He justifies his belief on "my significant knowledge and experience in treating structural back pain" [He does not use published peer- reviewed high quality medical science and instead substitutes his personal experience.  These do not match required bases for expert opinion.]

P. 57 "What I would say is these injuries are consistent with disc injuries that we treat in many, many patients.  And so I feel comfortable making that statement."  [The first is a restatement: injuries are consistent with injuries, a tautology.  The second is his feeling of comfort.  Comfort while making a statement does not make it true or medically correct. Neither "consistent with" nor "comfortable" conform to required science standards to offer an expert opinion.]

P. 63  Dr. Gornet does not participate in insurance plans to cover treatment fees but places a lien on all patient charges.

P. 65  The lien wording insures that Dr. Gornet is paid before any other party.

P.  66  "I'm a world authority on disc replacement."  [An authority can pronounce both true science and opinion without reference to published medical literature.  He is his own source for medical truth regarding disc replacement.]

P. 71 Total charges on the lien are almost $244,000.

[By definition, a medical fact witness testifies as to facts and treatment  but does not offer opinions as to cause or permanent restrictions-impairment.  A medical expert witness offers opinions as to cause or appropriateness of treatment and should not be the physician who treated the patient.]

P. 71-2 Q. "Okay. By taking a lien on Mr. Maples' lawsuit, you have a financial interest in the outcome of this case?

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544   fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 15

A.  "No, sir."  [This is absurd, and is an obvious financial conflict of interest for any physician.]

P. 76-7  Dr. Gornet denied that the $244,000 lien created a financial conflict of interest, indicating he was "insulted" by such a suggestion.

P. 79    Q.  "you're also testifying here today as an expert witness in his lawsuit, right?
   A.  "I would say I'm his treating doctor.  I just happen to be a world expert."  "I'm a key opinion leader on disc replacement throughout the United States and around the world."
        [All experienced physicians know the difference between acting as a fact witness or as an expert medical witness as stated above.  He uses the answer to assert himself as an authority with no need to refer to published medical science for his opinions.  It is so because I say it is so.]

P. 80  Dr. Gornet acknowledged that he is unaware of the medical ethics involved in giving causation opinions about one of his own patients.

P. 86  Dr. Gornet agrees that "disc degeneration is just an aging of the disc." and that it is due to genetics.  [This does match published medical science.  Annular tears (fissures) are a part of this degeneration.]

P. 89  When confronted that the AR radiologist did not identify physical damage,  Dr. Gornet responded:  "Again, his report is not consistent with my knowledge."  [He places his personal knowledge above that of a trained radiologist in interpreting an MRI and offers no published science to refute the radiologist as in error in his report.]

P. 92  "I don't use that term because its nonspecific; what is bulging?"
Definition of bulging:  Lumbar Disc Nomenclature Version 2.0  "The presence of disc tissue beyond the edges of the ring apophyses, throughout the circumference of the disc, is called "bulging" and is not a form of herniation." P. 2528.

"Disc Injury" is a not a defined term in this summary of standards used to name disc morphology.

[Dr. Gornet repeatedly uses "annular tear injury" and other medically undefined nonspecific terms, contrary to published definitions, to justify treatment, but falsely testifies that bulge or bulging has no meaning.]

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 16

P. 110-1  Dr. Gornet refused to provide a direct answer as to whether five years of chiropractic treatment from 2015-19 documented a history of prior chronic back pain complaints (which they obviously do confirm).

p. 113  When asked specifically about published medical science which demonstrated psychosocial factors are important because "they predict risk factors for chronic disabling pain", he dodges and provides comments about FDA not mandating them for studies, and again dodges when asked "Mr. Maples wasn't in any type of FDA clinical trial, was he?"  [See science from American Pain Society endorsed by American Academy of Orthopedic Surgeons previously included in this report.]

P. 113-4  Dr. Gornet testified that psychosocial factors and evaluation are "not a part of my practice."  [Thus, he ignores the dominant factor for chronic back complaints, non-physical cause (e.g. non-structural back pain) , including patients with these factors in his evaluation population considering only physical explanation and surgery, rather than excluding these patient without physical cause from surgical treatment.  This doubles his potential surgical group.

P. 116 He stated that the radiologist identified a HIZ consistent with "an annular tear at L5-S1."  (This is a degenerative finding.)  Then he changes his terminology: "I said MRI strongly suggests annular tear disc injury, L5-S1."  [A "strong suggestion", a possibility, is only a hint not a "more probable than not" finding.  Dr. Gornet is consistent, repeatedly attempting to change a degenerative finding (HIZ or tear) to a traumatic "annular tear disc injury."  This is a deliberate attempted conversion of a degenerative condition as defined by published medical science to a term he will use as an opportunity to perform total disc replacement and assign trauma to some incident as a cause.  This is a deliberate falsification.]

P. 120  Dr. Gornet again bases his opinion as to cause on belief and does not offer any logical or scientific basis.

P. 123 When asked why he uses discography: "Well, because the annular pathology, in my personal experience, strongly suggests a structural back pain."  [He substitutes personal experience for published medical science to justify discography.  This does not meet medical standards for expert testimony.]

On this page he pleads ignorance of any guidelines which indicate that discograms are not recommended for diagnosing discogenic low back pain.  [The world expert in disc replacement should be aware of the science in this arena.]

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544   fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 17

p. 124 In response to a question on the rate of false positives in discography:
    A:  I'm not sure.  That's a good question.  I don't know.

[This is an amazing admission.   He does not know the rate when results are misleading ("false positive") on the discogram test he uses to select individuals for total disc replacement.  This is critical knowledge.]

He further states on the next page "I don't feel that there was anything that caused us concern regarding our accuracy of our diagnosis . . ."
[Dr. Gornet again substituted his feelings for science.]

P.  126-7  Dr. Gornet testified he knows the term "annular tear is nonstandard."  He then follows on page 129 when asked whether this nonstandard term should not be used: "No.  I disagree with that."  He repeatedly used "annular tear disc injury" to imply trauma where degeneration exists.

P. 131 When confronted with the science that annular tears are degenerative, he disagrees and testifies that Mr. Maples "annular tears" are from injury.  [Again, his opinion is contrary to published science.]

P.  134  Disregarding published radiology standards (Lumbar Disc Nomenclature Version 2.0) he offers not science but his belief:  "I don't believe that fissures are caused by the degenerative process."

P. 138-9  When Mr. Tucker quotes from Lumbar Disc Nomenclature Version 2.0 and asks Dr. Gornet to cease using the misleading term "tear" and instead use "fissure" as the scientific article states, Dr. Gornet responds:
    A:  " Well, you can decide what's legally inappropriate.  I'll decide what's medically inappropriate."

[Again, instead of using and following published peer reviewed standards, Dr. Gornet, the self-proclaimed world expert, places himself as arbiter of proper terminology over and above science.]

P. 140  Again Dr. Gornet asserts that annular tears are not degenerative based on his belief.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 18

P. 141 Dr. Gornet was asked if he used the current protocol standard for determining injury-relatedness.  He testified that he used his own methods to determine causation, not a published method.  [This does not adhere to standards for expert testimony where the physician is not allowed to use his training and experience but must use published peer reviewed methods and science.  He ignores the AMA/NIOSH  protocol, the medical science standard to assign causation for an alleged injury.]

P. 142  To establish causation Dr. Gornet determines whether patient history "was consistent with that", ignoring science regarding the reliability of patient reports for determining causation.

P.  143  Dr. Gornet uses patient report plus treatment as basis enough to establish an injury.

[Patient reports are unreliable for causation determination.  Treatment for complaints does not objectively establish trauma or pathology.]

P. 144 Dr. Gornet states he is unfamiliar with published science on the reliability of patient reports as a basis to determine causation.


[Dr. Gornet in his testimony repeatedly substitutes his self-proclaimed standing as a world authority for published science.  He attempts to take an anatomic finding of annular "tear – fissure – HIZ" clearly defined as degenerative and by adding "disc injury" convert this to a traumatic event of whatever timing the patient reported.

He excludes any evaluation for "psychosocial" causes from his practice, thereby increasing the number of possible candidates for surgery by at least a factor of 2.  He uses discography based on his experience – ignoring science which has demonstrated it is unreliable.  He admits he does NOT know the false positive rate of the test he uses to determine who gets disc replacements and at what disc levels.  He follows no published peer reviewed method to assign causation, instead substituting his self-proclaimed status as a world authority.

It is clear from this testimony that Dr. Gornet operates on individuals with normal for age anatomy (such as Mr. Maples) with "annular tears", without testing for and eliminating individuals with non-anatomic (psychosocial) pain complaint origin.  He assigns causation based on patient history.]

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 19

He uses the lien system to garner huge fees (his charges are 3 x normal) performing more disc replacements that anyone else in the United States.  This is a not an objective evidence-based medical science practice model.  It is an very profitable economic model.]

SUMMARY:

Pain complaints are of either physical or non-physical (psychosocial) origin.

Subjective patient reports and post hoc reasoning do not justify a causation opinion.

The combination of subjective patient report (unreliable) and "post hoc" reasoning (false logic) is not a satisfactory objective basis for causative attribution.  This is emphasized in the AMA Guides Protocol for determining "Injury-Relatedness."  (AMA Guides Newsletter, May/June 2012)

There is no objective evidence of physical damage/traumatic anatomy to explain long term (chronic) pain complaints as objectively identified in this medical record.  No physical basis for pain complaints was discovered.  Treating physicians provided no objective evidence of any physical damage/traumatic anatomy.      Although Dr. Gornet asserts that the degenerative changes are pre-disposed to an injury, medical science does not support this.

James Maples was operating an UTV on 11-23-19 when one of the wheels became detached.  He reported he was jerked to a stop.  He complained of low back pain and was seen in the office on multiple occasions by Dr. Blair.  I was unable to identify a standard low back plus lower extremities physical and neurological examination in any of Dr. Blair's encounters.  Most of the notes are repetition of previous electronic medical records verbiage.

He was referred for 12-16-19 lumbar MRI evaluation 23 days after the railroad event as an attempt to explain back pain. As noted in the following science, MRI examination is not explanatory for low back pain complaints.

The findings from the MRI performed three weeks after the event document that no traumatic anatomy/physical damage was discovered nor was neurological compression identified.  Anatomy was the same as before the ATV event (status quo ante).  Thus, clinical categorization as a strain/sprain was appropriate.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 20

A spinal sprain or strain is diagnosed based upon the described onset of axial pain that a patient relates to a particular incident.  It is indistinguishable from spontaneous spinal pain, an unavoidable and common human condition.  There are no pathoanatomic findings on imaging, and no objective physical findings specific for the diagnosis.  Medicine cannot distinguish between a spinal sprain and a spinal strain.  These clinical diagnoses are interchangeable.

Complaints and symptoms related to a spinal sprain and/or strain typically resolve within a few weeks in the normal population without measurable residuals.  Resolution cannot be accelerated by treatment, and there is little scientific basis for any medical or non-medical remedy.  The best treatment is for a person to remain active.  Bed rest is contraindicated.  However, superfluous treatment, work issues, and mental pathology predictably prolong a person's symptoms.

Spinal sprain and strain are clinical diagnostic terms based on subjectively described symptoms without objective findings.  Therefore, a sprain/strain diagnosis does not satisfy step 1 of the requirements of the NIOSH/AMA injury-relatedness or work/relatedness protocol (AMA Guides Newsletter May/June 2012) and is not useful for forensic or causation diagnostic purposes.

Since there was no alteration of anatomy, there was no work-related basis for further treatment or evaluation from the 11-23-19 event.  All spinal changes were preexisting, degenerative, and multi-level, matching scientifically documented genetic origin, progressive with time.

The best treatment would have been reassurance, non-narcotic medication, and return to work unlimited (RTWU) immediately.

Whenever a patient is returned to work unrestricted (RTWU) the chances of successful outcome are increased when compared to work restrictions based on patient's symptoms.  In the early treatment of acute low back pain, "The sooner the recommendation is made to return to work, the more likely the patient is to comply.  The probability of return to work decreases as length of time off work increases," and, "There is no conclusive evidence that an early return to work causes harm to the back." (Spine; 1994, 19;#18:2033-2037)  "Symptoms do not harm," so "work restrictions are not appropriate based only on symptoms."  (AMA Guides to the Evaluation of Return to Work Ability and Return to Work, page 13).

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 21

When Mr. Maples was seen first evaluated by Dr. Jim Adametz, his neurological examination excluded radiculopathy as a working diagnosis (sciatic pain complaints would have been more accurate).  Epidural steroid injection and SI joint injection failed to relieve his chronic pain complaints. No structural deformity justifying surgical intervention nor damage due to the event of 11-23-19 was identified by Dr. Adametz nor was present on the MRI evaluation.

No evaluation for a non-physical (psychosocial) explanation for pain complaints was performed by any physician in this file even though such diagnoses are the predominant causes of chronic back pain complaints involving on the job injury allegations.

No physician identified traumatic anatomy or traumatic extrusion of a disc.  Mr. Maples' medical category is of minor injury, low-energy event.  To move to the high-energy category a fracture of major long bone, pelvic fracture, spine fracture or visceral disruption of an organ is required and none existed.   Although he presented to Dr. Gornet with chronic low back pain, no differential diagnosis for the most common explanation of low back pain was performed.  Dr. Gornet limited his diagnostic considerations only to  physical explanations and identified only degenerative changes including annular fissures or tears at multiple levels.

Medical facts regarding low energy/minor trauma as it relates to chronic back pain was established by prospective medical analysis and summarized in the AMA Guides Newsletter on Chronic Pain (Jan/Feb 2013).  "Minor trauma' was defined as 'any perceived injury to the low back area with a back-pain intensity >2/10 for at least 48 hours but not meeting the major injury definition.'  The 'major injury' definition was LBP associated with high energy trauma resulting in serious visceral injury, proximal long bone, or pelvic or spinal fracture or dislocation.'"  The results are quoted, "Minor trauma was only associated with serious low back pain in a compensation setting.  None of the participants who were not eligible for compensation developed serious LBP after minor trauma." (p. 2-3)   No anatomic major injury was present in this file.   In the absence of criteria which satisfy the definition for major trauma, the development of LBP complaints is predicted by eligibility for compensation, a medical fact consistent with other published information.

Due to complaints of continued back pain and radiation primarily to the left lower extremity, he was evaluated in Missouri by Dr. Gornet who suspected a "disc injury" but used nonspecific language and spoke of annular "tears" as if these are traumatic anatomy, and repeatedly enters "annular tear injury" in his records.  As previously cited, national published medical standards document annular tear, annular fissure, high

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544   fax (501) 224.8701  earl.peeples@att.net

UPRR 001802

James Maples
PMLC# X3022
Page 22

intensity zone are synonymous and reflect degenerative changes in the annular portion of a lumbar or other discs.  Use of "annular tear injury" is deliberately misleading.

All findings in the lumbar spine were degenerative and multi-level, consistent with the known origin of those as genetic and progressive with age.  They were preexisting and unchanged by the 11-23-19 event.

Discography was utilized to identify "provocative disc."  Such testing has been documented in medical science to be unreliable and is not a basis for appropriate selection of either spine fusion or spine disc replacement.  Dr. Gornet admitted he does not know "false positive" rate on the discography he performs to select disc replacement cases.

Medical science in "An Evidence-Based Clinical Practice Guideline From the American Pain Society" states in the first recommendation . . . "provocative discography is not recommended as a procedure for diagnosing discogenic low back pain …" and  "There is no evidence that use of provocative discography to select patients for fusion improves clinical outcomes."  (SPINE Vol. 34, 1066-77 – recommendation #1).   Medical society-endorsed clinical guidelines are the strongest level of medical publications useful in clinical practice.  Discogram, which produced only pain in a degenerative disc, is an anticipated finding and not a basis on which to justify fusion surgery or disc replacement surgery.

The highest quality prospective matched cohort scientific study discovered that "modern discography techniques using small gauge needle and limited pressurization resulted in accelerated disc degeneration, disc herniation, loss of disc height and signal, and the development of endplate changes compared to matched controls."  (Spine (2009) vol. 34, #21, p 2238-45)  Discography, a procedure which produces no clinical predictive benefit for surgical selection and which causes or accelerates disc damage, should be avoided.

The New England Journal of Medicine review article "Persistent Low Back Pain" (NEJM 352;18, May 5, 2005, p 1891-1898) states "Risk factors for the development of disabling chronic or persistent low back pain (variously defined as lasting more than three months or more than six months) include pre-existing psychological distress, disputed compensation issues, or other types of chronic pain, and job dissatisfaction."  This same article stated, "In prospective studies of subjects with no or trivial low back pain who underwent MRI, neither baseline MRI findings nor changes over time were useful predictors of the subsequent development of low back pain."  Regarding discography,

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001803

James Maples
PMLC# X3022
Page 23

"One test used by some clinicians to direct invasive therapy is provocative discography, which involves injecting dye into an intervertebral disc.  Proponents of this test suggest that if injection into a disc reproduces a patient's usual low back pain, then that disc must be the cause of the patient's pain.  However, injection into a disc can simulate the quality and location of pain known not to originate from that disc.

Furthermore, disc injections are painful 30% to 80% of the time for patients who do not have symptomatic disc disease, but who have previous disc surgery or who have psychological distress, remote chronic pain, or disputed compensation claims.  A control study comparing outcomes of spinal fusion when discography was or was not used in the preoperative evaluation showed no difference between groups."  This article also states that psychosocial factors are so important that "they should be routinely assessed in patients with low back pain and taken into account in any decisions regarding treatment."

Dr. Gornet testified that such psychosocial evaluation is not part of his practice.

Nevertheless, elective surgery for chronic low back pain complaints in the form of two level disc replacement was performed By Dr. Gornet for undamaged degenerative anatomy in September, 2020.

No physical damage due to the event at UPRR employment was identified.  No alteration of Mr. Maples' multi-level degenerative anatomy was identified anywhere in the record; therefore there is no basis to assign the surgery to Mr. Maples' event on 11-23-19.

Treatment related to the railroad event should have ceased after the 12/16/19 lumbar MRI excluded change in anatomy or physical damage to the lumbar spine.

The combination of subjective patient report (unreliable) and "post hoc" reasoning (false logic) is not a satisfactory objective basis for causative attribution.  This is emphasized in the AMA Guides Protocol for determining "Injury-Relatedness."  (AMA Guides Newsletter, May/June 2012)

It is very important to remind the reader that the word "tear" as used in colloquial English implies acute violence whereas the more subtle word "fissure" implies a disruption of a contiguous structure.  In fact, both are synonyms medically, indicating different ways of describing progressive, genetically controlled, annular deterioration in the context of spinal degeneration.  Irrespective of how many times annular tear or

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001804

James Maples
PMLC# X3022
Page 24

"annular tear injury" is repeated in this file, it is not a traumatic finding due to the event at the railroad.

None of the MRIs identified any anatomy which would require restriction or exclusion from work on the railroad.  All treatment was based on pain complaints and Dr. Gornet identified no significant alteration of nerve function and clearly stated that there was not a compressive or neurological problem which needed correction.

Medical facts regarding low energy/minor trauma as it relates to chronic back pain was established by prospective medical analysis and summarized in the AMA Guides Newsletter on Chronic Pain (Jan/Feb 2013).  "Minor trauma' was defined as 'any perceived injury to the low back area with a back-pain intensity >2/10 for at least 48 hours but not meeting the major injury definition.'  The 'major injury' definition was LBP associated with high energy trauma resulting in serious visceral injury, proximal long bone, or pelvic or spinal fracture or dislocation.'"  The results are quoted, "Minor trauma was only associated with serious low back pain in a compensation setting.  None of the participants who were not eligible for compensation developed serious LBP after minor trauma." (p. 2-3)   No anatomic major injury was present in this file.   In the absence of criteria which satisfy the definition for major trauma, the development of LBP complaints is predicted by eligibility for compensation, a medical fact consistent with other published information.

The event with the UTV was low energy, minor event.

Current best evidence-based science addresses the allegation that low-speed impact causes physical damage (anatomic trauma) to the spinal discs.

"Intervertebral disc degeneration and disc lesions are common findings that may or not be symptomatic.  Low-speed MVCs are also common and may cause muscle strain and accompanying symptoms.  However, the motions, forces, and accelerations generated in low-speed collisions are less than those encountered in activities of everyday living. The scientific process of injury causation analysis leads to the conclusion that disc degeneration and disc herniations are preexisting and not caused by low-speed vehicle collisions.  While the pain caused by a muscle strain associated with a low-speed collision may prompt X-rays, an MRI scan, or other imaging study and reveal disc pathology, the 2 are coincidental and not causally related."  (AMA Guides Newsletter, Nov/Dec, Do Low-Speed Vehicle Collisions Cause Intervertebral Disc Degeneration or Herniations? 2018, p. 7)

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 25

Total disc replacement is an alternative to lumbar fusion. Outcome predictions and elective surgery for pain complaints in the absence of instability, in the absence of neurological deficit, have been analyzed in a meta-analysis as summarized below:

Meta-analysis of 211 published articles established in medical science the following: "Compensation status is associated with poor outcome after surgery.  This effect is significant, clinically important, and consistent."  (JAMA April 6, 2005, Vol 293, #13, 1644-1652) "Compensation status was the most significant predictor of outcome (when compared to all other demographic, diagnostic, and treatment variables)." (Ibid) I have recognized this in my own practice.  The probability of poor outcome should be strongly considered when elective surgery for pain is considered in a compensation or litigation situation.  Unless surgery offers a decided advantage over conservative non-operative treatment in such cases, it should not be performed.

Anxiety/depression, secondary gain, job dissatisfaction, smoking, medication/substance abuse, workers' compensation, and litigation are confounding variables and are relative contraindications to elective spine surgery for degenerative changes.   Overall, compensated patients had more than 3.75 times the odds for an unsatisfactory outcome when compared to a non-compensation cohort (JAMA, April 6, 2005).  "Lumbar fusion for the diagnosis of disc degeneration, disc herniation and/or radiculopathy in a [compensation] setting is associated with significant increase in disability, opiate use, prolonged work loss and poor RTW [return to work] status."  (Spine, 2011, vol. 36; 4:320-331).

There is no evidence in this file provided by any physician of acute physical damage/traumatic anatomy due to the event of 11-23-19.  This was excluded by the MRI ordered by Dr. Blair which identified no traumatic anatomy.

Multi-level degenerative changes in the lumbar spine are ubiquitous in the fifth decade to a lesser or greater extent and do not reflect specific single event trauma.  This includes the annular deterioration named as either HIZ (high intensity zone), annular fissure, or annular tear.  These terms are synonymous and identify degenerative changes.

Elective surgery for unchanged anatomy and multi-level degenerative changes performed by Dr. Gornet was not required due to the event of 11-23-19 at Union Pacific Railroad.   Dr. Gornet cannot use standard medical definitions and then claim that an annular tear is a single event trauma. As previously noted in the science included in this report they are the three words commonly described as annular degeneration.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 26

The use of "annular tear" and "annular tear injury" repeatedly is pejorative and inaccurate.

Upon review of Dr. Gornet's deposition, he attempts to assign cause to the railroad event for chronic pain complaints and the degenerative changes he identified both by MRI he ordered and discography. He stated that there is no neurological problem with the nerve roots passing by the discs and into the lower extremities, so there is no explanation for chronic sciatica-type leg complaints based on examination or radiographic/MRI studies

It is clearly stated in AMA Guides science publications that when a physician is treating chronic pain, he has accepted and believes that pain is present; therefore, it is unethical for such physician to provide causation opinions (AMA Guides Newsletter Sept/Oct 2005 quoting Sullivan and Loeser, Archives of Internal Medicine 1992).

"Finally, all treating clinicians owe their allegiance to the patient, rather than to the judicial and administrative decision-makers who are dependent upon impairment evaluations and other forensic conclusions to complete their duties. Thus, the decision-makers are in no position to demand accountability from such treating clinicians and cannot reasonably expect objectivity".

"Given all of the above considerations, treating clinicians may be well advised to avoid forensic activity, regardless of what their specialty might be."

"All treating specialties share the same bias toward offering treatment for almost any and all complaints, rather than engaging in the type of cautious skepticism that is necessary for competent impairment evaluation and other forensic duties."

"And no treating clinician, regardless of specialty, can offer their allegiance to the judicial and administrative decision-makers who are dependent upon medicolegal evaluations and other forensic reports, when that treating physician has already established allegiance to the patient." (AMA Guides Newsletter, September/October 2005, p. 11)

Similarly, the American Academy of Orthopedic Surgeons and general ethical standards from the AMA for testifying physicians indicate that a physician may not testify and provide an expert/causation opinion when he has a financial interest in the outcome of the case. Such a disqualification is documented in the sworn testimony of Dr. Gornet who has at least a $243,000.00 lien which will be collected if the litigation is successful and will not be if unsuccessful, an obvious and massive financial conflict of interest.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544   fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 27

There is no objective identification of traumatic anatomy independent of patient report identified in this medical record sufficient to pass step one of the AMA/NIOSH Injury Relatedness Protocol requiring same.

Differential diagnosis process for more likely explanations, psychosocial factors, in this work-related context were not performed.

In this medical record, the most probable medical diagnosis was not objectively tested for and ruled out.  Rather, a less likely diagnosis which was supported predominately by patient report was pronounced and treated.

A physician must be scient (knowing, aware, knowledgeable) for the conditions and presentations he or she accepts for treatment or evaluation, or he or she should refer the patient to another physician who is capable in that task.

Medical school teaches student physicians to objectively test for the most likely explanation or diagnosis matching a presentation composed of history and physical findings before proceeding to a less likely diagnosis.  Diagnoses are defined precisely so as to facilitate communication between physicians, and the clinical criteria necessary to establish a diagnosis is available in published medical science.   The "Differential Diagnosis" list is ranked from probable, to likely, to unlikely, to improbable, and finally to rare.  Objective evidence-based published medical science is the standard utilized to eliminate a more likely diagnosis before moving to a less likely condition and treating it.

The physician must be familiar with and consider all types of diagnoses, not just those of personal specialty or interest.  Applicable logic and the method for securing an explanatory diagnosis is contained in the AMA protocol.   For a diagnosis to meet medical standards in a legal or forensic setting, this process must be followed and documented.  This is particularly true when a less likely diagnosis is supported only by subjective data.

The responsibility to use best logic and science is not avoided by substituting physician belief, feeling, training, or past clinical experience.   When published scientific knowledge (best objective evidenced-based medical science) does not establish the diagnosis, the diagnosis is rightly rejected as not meeting medical standards. Presentations, primarily of pain complaints, are not an exception.  Science demonstrates that with such a clinical presentation, an anatomic general medical diagnosis is, more probably than not, unobtainable.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 28

This record does not support injury-relatedness creating anatomic problems or explanations for chronic pain complaints due to the single event of 11-23-19.  Therefore, the cause of these complaints is non-spinal, non-physical in nature, unrelated to the Union Pacific Railroad event.

Since there was no change in anatomy due to the 11-23-19 event, there is no objective logical basis consistent with published standards to remove from work or restrict work activities.

 To summarize:
1. No traumatic anatomy/physical damage due to the 11-23-19 event was identified by any physician nor by radiographic testing/imaging.
2. After the 12-16-19 MRI no additional evaluation or treatment due to the 11-23-19 event was warranted.
3. "Annular tear" and "annular tear injury" are not traumatic but rather degenerative in nature, and occur normally as the spine degenerates and ages.
4. Irrespective of how many times you call a donkey a horse, it does not become a horse.  "Annular tear," no matter how often stated, remains degenerative.
5. No differential diagnosis process considering more probable psychosocial explanatory factors was conducted, rendering physician diagnoses and opinions unsupported and invalid.
6. When considering only a spinal and traumatic explanation for pain complaints, a traumatic spinal explanation will be asserted.
7. Discography is not a valid method endorsed by objective evidence-based medical science to determine need for fusion or total disc replacement.
8. Since there was no change in anatomy form the 11-23-19 event, no work restriction, removal from work, nor permanent impairment is justified.
9. Dr. McAlister's expert radiology report confirms my review of the records.  There is no physical damage/traumatic anatomy identified after the 11-23-19 event.
10.  Replacement of anatomically normal for age discs was not justified based on the 11-23-19 event.

The opinions stated in this report are based on the medical information in the form of medical records provided to me.  Should additional medical information or records be provided, it is possible my opinions might be modified or changed. Medicine is an inexact science, however, the opinions stated above are based on a reasonable degree of medical certainty.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 29

Earl Peeples MD

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001810

James Maples
PMLC# X3022
Page 30

METHODS ADDENDUM:

"Medical evidence is drawn from observation, and medical conditions are multifactorial and more likely to be controlled by probability than a single cause or event." (AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2008, p. 14)

Evidence-based medicine is a "set of principles and methods intended to ensure that to the greatest extent possible, medical decisions, guidelines, and other types of policies are based on and consistent with good evidence of effectiveness and benefit." (Health Affairs 2005; 24 (1), 9-17) It is "The conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individual patients." (Sackett er al. (2000) Evidence based medicine: how to practice and Teach EBM. Churchill Livingston)

Objective evidence-based methods were utilized in my analysis of these records. My opinions are based on sufficient facts or data and are the product of reliable principles and methods which have been applied to the facts of the case. My opinions are based on "review of experimental, statistical or other scientific data" provided by others in the form of medical records and radiology reports. This is the basis on which I was trained and on which I satisfied the requirements for board certification; that is, training in which a medical history, oral or written, and radiographs or other objective testing data is provided. Residents in training are then asked to determine a diagnosis and justify a specific treatment. It is this method which was utilized by the American Board of Orthopedic Surgery in 1980 when I was orally tested for board certification. A series of senior orthopedists presented radiographs and histories of patients, and I had to provide a diagnosis, discussion, and satisfactory plan of care for each in order to pass that exam. Review of medical records for forensic purposes is a similar, almost identical, undertaking for a different purpose; that is, instead of proving one's proficiency in orthopedics, it is for the purpose of explaining either the presence of, or the absence of, evidence of a medical condition as it relates to specific alleged causation.

A general medical condition is a non-psychiatric, non-psychological diagnosis attributable to abnormal anatomy or physiology. In this medical record analysis, I have compared history, symptoms, findings, and treatment to established medical science and sought to objectively identify a musculoskeletal, orthopedic, or general medical condition or diagnosis related to the incident(s) or employment of interest. In many forensic cases, no general medical diagnosis can be objectively established and no general medical explanation for symptoms is discovered.

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001811

James Maples
PMLC# X3022
Page 31

If called to testify live, I may use anatomic models or drawings to help explain my findings and opinions to a jury.

Multiple published medical ethics guidelines state that physician charges may not be based on the outcome of a case or related to any type of contingency fee system. My charges are based on my time and not my testimony or the content of a report. This is consistent with published ethics guidelines. (Ethics Manual, American College of Physician, 5th Edition, 2005, and Annals of Internal Medicine, 2005; 142:560-582, and AAOS Guidelines- Adopted April 18, 2005, Amended May 12, 2010)

I have reviewed the medical records as an independent physician, one who is not involved in treatment of the patient. As established in published AMA science (The Guides Newsletter, September/October 2005, AMA, Who Is in the Better Position to Evaluate, the Treating Physician or an Independent Examiner), this gives me an advantage in determining diagnosis and impairment on a factual scientific basis. Significant science from this publication includes:

"By definition, the physician is not in an independent role if that physician already has accepted a treating role for the patient/examinee. . . an independent evaluator may not be unbiased if he or she strays from the standards of the Guides . . . However, these issues are more likely to be problematic for the treating physician since there is an inherent patient advocacy role. It is probable that the treating physician will not consider new or alternative diagnoses at the time of rating. It also is possible that the treating physician will causally relate problems to an injury if this appears advantageous to the patient and/or the physician." (p. 8)

"In a 1992 article published in the Archives of Internal Medicine, Sullivan and Loeser, pointed out that it was unethical for a physician to serve in both a treating and an impairment evaluation role for the same patient when the focus of treatment is chronic pain." (p. 8)

"Clinical relationships typically benefit from the clinician adopting a supportive, accepting, and empathic attitude; while forensic evaluations typically benefit from the evaluator adopting a neutral, objective, and detached attitude." (p. 9)

". . . the treating clinician looks for disorders to treat, rather than introducing sufficient skepticism to recognize when there is no such disorder." (p. 10)

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

James Maples
PMLC# X3022
Page 32

"All treating clinicians can benefit financially from offering opinions that a condition is work-related, injury-related, valid, disabling, and in need of further treatment. Treating clinicians often find themselves in a position where they would be cutting off a source of their own income if they were to offer opinions that the clinical presentation is not valid, not work- related, not injury-related, not disabling. . . and/or not in need of further treatment." (p. 10)

"All treating specialties share the same bias toward offering treatment for almost any and all complaints, rather than engaging in the type of cautious skepticism that is necessary for competent impairment evaluation and other forensic duties." (p. 11)

My evaluation of these records was conducted using published AMA Guides Protocol to determine injury-relatedness or work-relatedness (AMA Guides Newsletter May/June 2012), using its methods to avoid just these types of bias and conflicts. This protocol was developed by NIOSH (National Institute of Occupational Safety and Health), adopted by the American College of Occupational and Environmental Medicine (ACOEM), adopted and published in the AMA Guides to the Evaluation of Disease and Injury Causation (Second Edition), published in condensed form in AMA Guides Newsletter May/June 2012, and recommended by AAOS (American Academy of Orthopedic Surgery) instructional courses as the current scientific method to separate work-or injury-related conditions from general medical conditions which are of non-work and non-injury origins. It is the current standard for this purpose.

Causation and impairment are inextricably linked. It is necessary to analyze for causation before impairment related to a specific event can be determined. [An individual with a missing index finger, a three-fingered hand, who presents to a physician with a bruise or hand strain has 20% impairment of function of the hand due to the absence of the index finger. However, no impairment due to the event is present because the event did not cause the loss of the finger.] The AMA Guides Newsletter protocol "Determining Injury-Relatedness, Work-Relatedness, and Claim-Relatedness" (May/June 2012) summarizes a six-step logical process from the second edition of the AMA Guides to the Evaluation of Disease and Injury Causation. If followed, it produces an objective opinion, free from bias.

"The original work toward the creation of this protocol is credited to the National Institute of Occupational Safety and Health, and prior adaptation of the protocol is credited to the American College of Occupational and Environmental Medicine". (p.6) (NIOSH and ACOEM) It is an established part of the AMA Guides system and recommended as the

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544   fax (501) 224.8701   earl.peeples@att.net

UPRR 001813

James Maples
PMLC# X3022
Page 33

standard by the American Academy of Orthopedic Surgeons (AAOS) at its educational courses. The steps are as follows:

1) Definitively establish a diagnosis (an explanatory diagnosis)
2) Apply relevant findings from epidemiological science to the individual case
3) Obtain and assess the evidence of exposure (to that epidemiology)
4) Consider other relevant factors (differential diagnosis/other explanation)
5) Scrutinize the validity of the evidence
6) Evaluation of results from all of the above (review each previous step)

The protocol emphasizes that this analysis must be objective and credible. It stresses avoidance of unreliable information (patient reports) and false logic (post hoc reasoning) on page 5. The protocol emphasizes the use of objective evidence and science, rather than subjective information, in order to produce a reliable causation opinion.

In Step 1 the evaluator must ask the question, "Did I find evidence of the diagnosis that is completely independent of what the examinee told me," and the evaluator must have "conclusively ruled out all other potential explanations for this clinical presentation, especially those that are more likely than my diagnosis?" This first step states that the evaluator should ask for a "full set of records", especially pre-claim records (Page 6).

Step 2 requires the evaluator to consider the most well-established risk factors from epidemiological science for the diagnosis.

Step 3 asks the evaluator to consider if the accident or event in question produced the right type and magnitude of exposure to create the alleged condition.

Step 4 requires the evaluator to ask, "are there risk factors other than the cause that is being claimed in this specific case that could contribute to the development of the clinical presentation?" (Page 8).

Step 5 requires the evaluator to review of the quality of evidence and warns: "evaluators should note the scientific findings which indicated an approximate rate of 100% of examinee-reported histories as being false when the examinee was blaming someone else for his or her health complaints" (p.9).

"When an examinee blames someone else for his or her injury or accident, and claims that he or she never experienced relevant health problems before the injury or accident; such denials of pre-existing health problems are almost always found to be false ….

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 34

Given the extreme unreliability of such denials of relevant pre-existing problems, the common reliance on reports from claimants or plaintiffs for purposes of making causation determinations is not justifiable." (p. 5)

Additional information regarding the unreliability of patient reports is contained in the Guides Newsletter of Sept/Oct 2009, "Examinee-Reported History Is Not a Credible Basis for Clinical or Administrative Decision Making:

> "The unreliability of the examinee reports is especially pronounced when the examinee has filed a medical-legal claim. Consequently, reports from examinees are simply not a credible basis for clinical, forensic, or administrative decision making." (p. 1)

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

UPRR 001815

James Maples
PMLC# X3022
Page 35

RELEVANT SCIENCE SECTION:
The AMA Guides specifies common developmental spinal findings as (1) spondylolysis
found normally in 7% of adults; (2) spondylolisthesis found in 3% of adults; (3) herniated
disc without radiculopathy, found in approximately 30% of individuals by age 40 years;
and (4) aging changes present in 40% of adults after age 35 years and in almost all
individuals after age 50.  As previously noted, "the presence of these abnormalities on
imaging studies does not necessarily mean the individual has an impairment due to an
injury."  (AMA Guides to the Permanent Impairment of Function, 5th Edition, page 383).

The appearance of new disc bulges and/or herniations is not proof of trauma, as these
commonly occur spontaneously due to degeneration.  Such findings do not confirm
symptoms nor are they a dependable measure of symptom severity.  Particularly in this
case, the pattern of multilevel cervical, thoracic, and lumbar disc pathology is consistent
with widespread spinal degeneration, not trauma.


In many cases a physician may form an opinion based on temporal appearance that an
event aggravated a preexisting condition. Such an assertion, be it belief or opinion, is
specifically eliminated on page 5 of the AMA Guides Newsletter, "Determining Injury-
Relatedness, Work-Relatedness, and Claim-Relatedness, (May/June 2012):

>    the subjective patient report is discussed first. "..when an examinee blames
>    someone else for his or her injury or accident, and claims that he or she never
>    experienced relevant health problems before the injury or accident; such denial
>    of pre-existing health problems are almost always found to be false…Given the
>    extreme unreliability of such denials of relevant preexisting problems, the
>    common reliance on reports from claimants or plaintiffs for purposes of making
>    causation determinations is not justifiable."

Readers of this report unfamiliar with the scientific basis of the protocol and those
statements would benefit from reading the entire newsletter and understanding the
NIOSH/AMA protocol (AMA Guides Newsletter May/June 2012), the standard to
determine injury-relatedness or work relatedness consistent with best current published
science, the standard I use to form my opinions.

The scientific publication by Dr. R.J. Barth, Chronic Pain: How to Make Sense of It
Within Orthopedic Claims (Melhorn JM and Carragee E. 14th Annual American
Academy of Orthopedic Surgeons Occupational Orthopedics and Workers

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 36

Compensation: A Multidisciplinary Perspective. 2012 AAOS) provides valuable recommendations. The following paragraphs summarize much of that science:

The findings from this review of records did not reveal a general medical explanation for the complaints of chronic pain. This is not a surprising result. The scientific knowledge base clearly indicates that psychological and social factors play a more significant role in the development of such chronic pain presentations, and that general medical factors generally do not play a significant role.

It is therefore recommended that further attempts to assist this individual focus on the scientifically established risk factors for such chronic pain presentations, rather than focusing on general medical issues which are highly unlikely to provide an adequate explanation.

For example, because scientific findings have revealed that compensation incentives are a dominant risk factor for the development of chronic pain, the examinee should be educated about the potential health benefits of extricating himself from compensation contingencies as soon as possible.

Additionally, the examinee should be adequately educated in regard to the primarily psychological nature of chronic pain. Subsequent to such education, the examinee should seek out a credible psychological evaluation (because scientific findings have revealed that psychopathology is another dominant risk factor for the development of chronic pain). The scope of that evaluation should include an intensive focus on the scientifically established risk factors for chronic pain (e.g. personality disorders), so that a relevant treatment plan can be developed for whatever findings emerge. For purposes of making sure that such an evaluation is credibly conducted, clear guidance can be found in the American Medical Association's Guides to the Evaluation of Disease and Injury Causation (mental illness chapter). Because the relevant issues are extremely unlikely to be injury-related or work-related, and because involvement in legal claims is reliably detrimental for health outcomes, the psychological evaluation and treatment should take place outside of a legal claims context.

The examinee should also be educated in regard to other scientifically established risk factors for chronic pain, such as smoking, obesity, and diabetes.

The examinee should be educated in regard to scientifically validated approaches to chronic pain, which have a high probability of being helpful regardless of what risk

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701  earl.peeples@att.net

UPRR 001817

James Maples
PMLC# X3022
Page 37

factors are actually applicable. Examples include the activity paradigm (responding to pain by increasing activity, instead of withdrawing from activity).

Back pain is so common that it must be considered to be a normal part of life, rather than a medical abnormality. The vast majority of presentations of low back pain are not injury-related, or otherwise associated with any general medical findings. For 85-90% of back pain cases, there is no general medical (non-psychiatric, non-psychological) diagnosis that explains the pain (JAMA 2001, Feb 1:344 (5): 363-70: AMA's Physicians Guide to Return to Work, Talmage and Melhorn, 2005.)

The International Association for the Study of Pain defined pain as an unpleasant sensory and emotional experience associated with actual, or potential, tissue damage, or described in terms of such damage. Pain is thus not a primary sensation in the sense that smell, taste, touch, vision, and hearing are, but it is an emotional state like sorrow, love, or hate.

"The prognosis for LBP usually is excellent. However, a minority of patients, approximately 10%, are still off work at half a year. This minority consumes a great majority of all the resources, and consequently the costs, spent on back problems." (Spine 25, #23, pp 3055-3069) These individuals demand careful evidence based medicine evaluation and treatment which is verified to predictably produce benefit. Failure to do this results in wasted resources and poor outcomes.

"The vast majority of evidence supports the notion that receiving compensation for low back pain or being unemployed is predictive of developing a chronic disability." (Barth RJ. Chronic Pain: How to Make Sense of It Within Orthopedic Claims. In: Melhorn JM and Carragee E. 14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS)

Personality disorders are associated with a tendency to be litigious. (Yudofsky, SC. Fatal Flaws. American Psychiatric Publishing, 2005.) "Since such individual [with personality disorders] does not realize that their personality creates problems, they tend to blame others for those problems." "As a consequence, personality disordered individuals file legal claims at an elevated rate, thereby causing personality disorder to be especially common in all types of litigation and disability claims." (AAOS Occupational Orthopaedics and Workers' Compensation Course, 2013, pp. 913-919.) The importance of personality disorder is also reviewed in the AMA Guides Newsletter of Jan/Feb 2013, "Chronic Pain: Fundamental Scientific Considerations, Specifically for Legal Claims".

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544   fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 38

The fact that a claim has been filed or appealed merits consideration of personality disorder as a contributing or causative factor. This is especially true in chronic disabling pain or spine claims where personality disorders are discovered at a very high rate if they are considered and identifying testing performed.

As reviewed at an educational American Academy of Orthopedic Surgeons publication (November 2011), compiled from multiple published studies, medical science documents that absence from work:

- is detrimental to a person's mental health
- causes exacerbation in the duration and severity of pain complaints
- prevents improvement in brain functioning after injury
- is a scientifically established risk factor for cancer
- is a scientifically established risk factor for hypertension
- is a scientifically established risk factor for heart attack
- is a scientifically identified risk factor for early death

A significant quote from Dr. Stanley J. Bigos, noted for his analysis of work-related injuries, is, "I am still waiting for the first studies which demonstrate that we can help somebody by taking them out of work."

Work is a manifestation of motivation, determination, and effort.  Without demonstrable physical evidence to preclude work activities, return to work is the best practice model.  That is the reason we can hire the disabled, handicapped, amputees, and other people with issues.  The American Medical Association, American Academy of Orthopedic Surgeons, and American Academy of Disability Evaluating Physicians have well stated position papers regarding return to work as early as possible as being the best treatment for on-the-job injuries.  Other contemporary references corroborate those findings.  Early return to work reduces morbidity and disability, particularly in cases wherein compensation is an issue.  When the risk of re-injury is minimal or nil, then the capacity, tolerance, and performance are under the control of the claimant.

The following four consensus statements are quoted from AMA Guides to the Evaluation of Work Ability and Return to Work (AMA 2011), page 3-5.

"Prolonged absence from one's normal roles, including absence from the workplace is detrimental to a person's mental, physical, and social well-being.  Physicians should therefore encourage a patient's return to function and work as soon as possible after an illness or injury…"

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

James Maples
PMLC# X3022
Page 39

"Medically related withdrawal from normal social roles, including work, is destabilizing and may be detrimental to a patient's mental, physical and social well-being; maintaining or returning a patient to all possible relevant life activities as soon as is safely possible has many beneficial psychosocial and physical effects…."

"The AMA encourages physicians everywhere to advise their patients to return to work at the earliest date compatible with health and safety and recognizes that physicians can, through their care, facilitate patients to return to work."

"Thus, there is sound science indicating that unemployment is hazardous to a patient's physical, mental and social wellbeing.  As patient advocates, physicians, therefore, should strongly urge patients to return to work or to stay at work and should decline to certify disability unless it is obvious.  Ethically, in these cases, beneficence trumps autonomy."

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

UPRR 001820